Frank Sertaut, Appellee, v. Crane Company, Appellant.

Gen. No. 13,905.

1. APPEALS AND ERRORS—*when rulings upon evidence should be substantially accurate.* Where the case is close, the rulings upon evidence should be substantially accurate or a reversal will follow.

2. EVIDENCE—*when objection must be specific to justify exclusion of question.* It is error to exclude a proper and important question upon re-cross examination merely upon a general objection.

3. EVIDENCE—*what competent upon question of injury. Held,* error to strike out an answer as follows: "He appeared all right" made to a question as follows, "And what was his appearance *then,*" "then" referring to a time about a half hour after the accident complained of.

4. EVIDENCE—*effect of talking through interpreter.* If a party has talked to another through an interpreter, he thereby constitutes such interpreter his agent, and what he has said through such interpreter may be given in evidence by the person to whom the interpreter has at the time made communication.

5. EVIDENCE—*what essential to render exclusion of, prejudicial.* In order to make the exclusion of evidence prejudicial, an offer of proof should be made, showing the pertinency and importance of the evidence excluded.

6. EVIDENCE—*right to ask injured party for examination.* It is error to deny to a defendant sued for a personal injury the right to ask the plaintiff upon the stand for an opportunity to make examination of his injuries.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in this court at the October term, 1907. Reversed and remanded. Opinion filed July 6; 1908.

WING & WING and FRED W. BENTLEY, for appellant.

JOHNSON, BELASCO & McCABE, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

The appellee was plaintiff and the appellant defendant in the trial court and will be so referred to here. It is averred, in substance, in the declaration, that, February 1, 1904, plaintiff was in defendant's employ as a laborer, and the defendant had in its building or plant, where plaintiff was employed, an elevator running through said building and controlled and operated by defendant, and defendant ordered plaintiff to ride on said elevator to a certain floor of said building. It was defendant's duty to furnish plaintiff with a reasonably safe place in which to work, but the defendant negligently permitted and allowed the said elevator, and parts thereof connected with the same, to be and remain in a weak, unsafe and dangerous condition, and permitted and allowed the ropes by which said elevator was hoisted, and the ropes connected with the said elevator, to be and remain in a weak, unsafe and dangerous condition, and to be not fastened to the elevator with reasonable safety; and permitted and allowed the parts connecting the said ropes with the said elevator, and the parts holding the said ropes to the said elevator, to be and remain in a weak, unsafe and dangerous condition, and so that the said ropes of the said elevator connecting the said elevator were not connected with reasonable safety to the said elevator; and permitted and allowed the said safety devices connected with the parts of the said elevator to be and remain in a weak, unsafe and dangerous condition, and so that they did not perform their functions; and permitted and allowed the safety devices connected with the hauling apparatus of the said elevator to be and remain weak, unsafe and in a dangerous condition, and out of order, and so that the same did not work with reasonable safety, of all of which facts the defendant had notice, or, by the exer-

cise of reasonable care, should have had notice, but of which facts the plaintiff had no notice, and, by the exercise of reasonable care, could not have had notice. And the plaintiff avers that, by reason of the aforesaid negligence of the defendant, while he, the said plaintiff, was riding upon the said elevator, as aforesaid, and while, at all times, in the exercise of due care and caution for his own personal safety, the said elevator fell from a great height, to-wit, six stories, by reason of the aforesaid negligence of the said defendant, to and upon the ground floor of said building, then and there and thereby greatly and permanently injuring the said plaintiff," etc.

The defendant pleaded the general issue; the jury found the defendant guilty and assessed the plaintiff's damages at the sum of $2500, and the court overruled defendant's motions for a new trial and in arrest of judgment and rendered judgment on the verdict.

The plaintiff is a Luthuanian. He was about twenty-seven years of age at the time of the accident in question, which happened in the morning of February 1, 1904. He had been in the employ of the defendant about nine months as a general all-round laborer, at the time of the accident. His wages were $1.75 per day. The elevator in which he was riding when the accident occurred was a freight elevator, with doors on its east and west sides, and was enclosed with wire netting on its north and south sides. At the top of the elevator cage there are what are called sheaves in the evidence, which are wheels or pulleys about six inches in diameter, and which, as we understand the evidence, including a very crude drawing, are attached to a cast iron arm. The sheave on the south side or end of this arm passes close to a beam at the fifth floor of the building. Noakes, the operator of the elevator, faced toward the east side of it, and he testified, in reference to this beam, that it is a part of the fifth floor and on the right or south side of the elevator shaft, and is about a foot square and serves as

a heading for the joists. The evidence is that when
the elevator ascends in a direct line, and without sway-
ing to either side, the sheave on the south side of the
arm clears it.          ,

At the time of the accident, the elevator was ascend-
ing from the ground floor on its way to the fifth floor,
where there was a foundry. The persons on the el-
evator were Noakes, the operator, Matt Sherlock, de-
fendant's foreman, who got off at the fourth floor,
Christian Hauser, who had charge of defendant's
carpenters and millwrights, the plaintiff and another
man; each of the last two had with him in the elevator
a wheelbarrow of wood and iron loaded with sand, to
take to the foundry on the fifth floor. Thomas W.
Smith, mechanical engineer, in defendant's employ,
testified that the sand, wheelbarrows and all, weighed
about 1,100 or 1,150 pounds. Whether this estimate
includes the weight of the persons on the elevator, is
left at least doubtful. When the elevator was between
the fourth and fifth floors, the arm on which the sheaves
were broke, the break being a short distance from the
sheave which was near the beam on the south side of
the elevator shaft. The sheave fell, the operating rope
came loose from the drum, the operator lost control
of the elevator and it ran down. Noakes testified, in
reference to the elevator, that it must have struck the
beam between the fourth and fifth floors and cracked
the sheave, and counsel, in view of this expression,
say that this was a mere supposition of the witness;
but the witness also testified: ''It struck the beam be-
tween the fourth and fifth floors,'' which evidence is
not abstracted. This means, as we understand, that
the elevator was between the fourth and fifth floors
when the sheave, which was at the top of the cage,
struck the beam. Smith, defendant's witness, testi-
fied: ''There were guides there to guide the elevator
cage, in passing through the hoistway or elevator
shaft. There are steel shoes connected on the ele-
vator and work on wooden strips. Those strips are

2⅝ inches by 2¾, and run clear from the basement to the top of the elevator shaft. There are two of them right in the center, and were lubricated once a week."

Noakes, the elevator operator, testified: "The guides are a strip of oak wood and run alongside of the elevator, the guide shoes keep the elevator from having too much play in the shaft. They clamp onto the guides." He says further of the shoes: "They were made of steel, I believe, or cast iron, and are a little bit larger than the guides themselves." This witness also testified that he helped fix the elevator after the accident, and that the guide shoes were worn a little; that he knew this from the jerking of the elevator; that he didn't see the shoes. He was questioned and answered as follows:

"Q. How often did you observe that lateral motion of the elevator?

"A. Well, not very often; they are bound to shake some.

"Q. About how often?

"A. I don't remember, it has been so long since I run that elevator."

There is no evidence that there was any observable defect in the arm of the sheave where it broke. The evidence of the defendant's witnesses is that there was not more than ⅝ inch of play in the guides, and that, in ascending, the sheave could not come within an inch of the beam. There is a conflict in the evidence as to the speed of the elevator in descending after the sheave broke, and the force with which it struck bottom. Noakes testified that it dropped fast and struck bottom pretty hard. Plaintiff testified: "It began to go rather slowly, then when we went down further, it fell of a sudden and struck the bottom." Christian Hauser: It went down about the same as it would go up. Fall had no effect on him; speed pretty fast; struck bottom reasonably hard. Matt Sherlock, who got off at the fourth floor: "When I got off I turned around and seen the elevator, in place of going up,

was going down at a fast speed. It seemed to me the ordinary run, probably a little faster; it was going, at the time, an ordinary run at top speed." Noakes testified that when the elevator struck bottom he was brought to his knees; but in a sworn statement made by him February 10th, the ninth day after the accident, he says: "The drop did not knock the wheelbarrows of sand off the elevator. The jolt of the elevator, as it struck the pit, did not bring any of us to our knees."

We will next consider the evidence as to the plaintiff's alleged injuries. Sertaut, the plaintiff, testified that when the elevator struck bottom it knocked him down backward on the buggy, injuring his back, when he became unconscious, and knew nothing thereafter till he found himself in an office, where he was undressed, washed and medicine applied to him, when he was taken home by two men, a distance of two blocks from the defendant's building; that he stayed at home six months, two months of which time he was in bed, unable to work, and that, at the time of the trial he still suffered from pain in his back and was unable to work continuously. Keidis, witness for plaintiff, testified that when the elevator fell he saw plaintiff and another man lying down in it, and that there was blood coming from plaintiff's nose and he was moaning. This is the only evidence that there was any appearance of blood on plaintiff at the time of the accident. Szaulis, plaintiff's witness, testified that when the elevator fell he saw Sertaut prostrate in it. Noakes testified that one of the men who had the wheelbarrows of sand complained of being injured. The defendant's witnesses testified as follows: Hauser: None of the men were knocked off their feet; no one was hurt that I could see. One of the men with the sand was sitting down. The men all walked out of the elevator. Sherlock: Ran down from the fourth floor to the elevator; the elevator operator was standing in it; no one was lying down in it; saw one of the sand men sitting on

one side against a wheelbarrow; saw no one who appeared to be hurt.

It appears from the evidence that plaintiff made some complaint, and was sent to the office of Dr. Andrew M. Harvey, who is employed by the defendant company to attend to its employes in cases of sickness or injury, and to care for the sanitary conditions of its plant, and whose office is on defendant's premises. Dr. Harvey testified that the plaintiff walked into his office, and that there was nothing unusual in his appearance; that he, witness, had his clothes removed and examined his body and extremities; that there was no blood on him anywhere, no abrasion or skin wounds, and no marks of any kind indicating injury, and that when he had concluded his examination he told him to put on his clothes, and, as he understood, he went back to his foreman; that, about a week later, he took to plaintiff's house an envelope containing his pay, and found him standing in the front room of the house, dressed, and that he walked about the room with a baby in his arms. Rudolph G. Hora is an assistant in Dr. Harvey's office, and testified that he was present and assisted in the examination of plaintiff. He says: "There was no blood on his back. I am sure of that. There was no mark or bruise on his back; there were no marks or bruises of any kind or character found in any place upon plaintiff's person. I couldn't find anything the matter with him. We sent him back to his foreman." Witness further testified that he saw plaintiff at his home about a week afterward; that he had his shirt and trousers on and was playing cards and was not in bed, and that he said his back ached a little. Michael J. Hayes, defendant's labor foreman, who was plaintiff's boss, testified that he saw plaintiff before and after he came back from Dr. Harvey's office, and that he walked just as he did on other days, but said that he was not feeling well, and witness sent him home. Dr. J. G. Wachowski was called as a witness by plaintiff. It ap-

pears from the evidence that the Doctor was called about five o'clock in the evening of the day of the accident, February 1, 1904. The doctor testified that he had been a physician and surgeon since March 22, 1902, and was a graduate of the Northwestern College of Physicians and Surgeons. He talked to plaintiff, who is a Lithuanian, through an interpreter, and treated him for about six weeks. He testified: "I found scars over his back, I believe about the second lumbar vertebra, and in there, on the left, the parts were contused, swollen and achymotic, congested, or rather filled with blood. That is all I could detect from the examination at that time." On cross-examination he testified: "I don't know how the scars got there; there were four or five of them; I think about half an inch to three-quarters inch of scars." He farther testified: "I visited him every third or fourth day for about a month and a half. Upon palpitation I noticed in the region of the spine, on pressure, was extreme tenderness in the region of the kidney, the right or left—I don't recollect—I believe it was the left, and I treated the case for his kidneys." The Doctor further testified: "I lived a distance from him and I couldn't exactly take care of the case right, so that I could call more frequently to examine the urine. I found it very discolored—more of a coffee color. I called for a month and a half. I couldn't exactly make a diagnosis. I could almost base a diagnosis."

"Q. Did you make a diagnosis or did you not?

"A. I have.

"Q. What was it? A. Due to that pain there he had on his left side he said it was, that radiating pain from the part he was struck or hurt, radiating down through his abdomen and part into the pelvis. The only indication there was, at the time he tried to pass his urine he had pain, that was due to a kidney affection, which may be a ruptured kidney or a floating kidney." It is plain from the testimony of this witness, as we think, that whatever opinion he had was

derived from subjective symptoms, and his testimony was objected to on that ground. If there were scars, as he testified, they were of course objective, but a scar is merely a cicatrix or mark on the place where a wound has healed, and, therefore, is not evidence of a recent injury. It can hardly be said that the witness made a diagnosis. He said: "I couldn't exactly make a diagnosis. I could almost base a diagnosis." He concludes on cross by saying, "He improved under my treatment rapidly."

Dr. L. R. Larsen was called as a witness by plaintiff, the latter part of May, 1907, about three years and four months after the accident. He testified that he had examined the plaintiff that morning "for the purpose of determining what was the result of a certain injury received some time previously." He says he found five scars from about the size of a pea to that of a three cent piece such as we used to have, between the small of the back and the lower part of the hip in the back, which were caused by some form of traumatism; that he could not tell whether the scars were six months or six years old. There was every evidence that he suffered from a traumatic form of myalgia. This latter expression, "traumatic form of myalgia" means, in plain English, muscular pain, or muscular rheumatism, or neuralgia, produced by some sort of force or violence. From these symptoms, and using what the witness calls palpitation, he arrived at the conclusion that the plaintiff's left kidney was displaced approximately an inch, and that the displacement would be permanent.

Dr. Price, defendant's witness, testified: "Assuming that the party walked directly after the accident leads me, right away, to give a very positive statement that there was no dislocation of the kidney. Where a kidney is dislocated there is immense shock, and there would be inability to walk or get around, such as going and walking 300 feet to a foreman, and to a doctor's office in the same building, and back

again.'' Also: ''The kidney is about three or four inches in length. The left is a little longer. If there was a displacement of one inch, I would not say it was out of place; I would call that natural. A displaced or floating kidney is at least four inches out of place.''

Dr. James Whitney Hall, called by defendant, testified that the kidneys are practically on a level, the left being slightly higher, varying from a quarter to three-quarters of an inch. Also: ''By palpitation with both hands, one on this side and one on that, and squeezing from the front and back, you could not be able to distinguish a difference of one inch in the height of those kidneys, in a majority of cases.'' The kind of palpitation mentioned was that used by plaintiff's witness, Dr. Larsen. Dr. Hall farther testified: ''In case of the dislocation of a kidney by violence, where the dislocation is sufficient to displace it so as to find it by palpitation, you would get very marked evidence of injury and you would have to have such violence, as the kick of a horse, directly over the kidney in the fleshy region, that would cause great indentation and would leave marked local evidence of injury at that point; the effect on the general system would be that of marked and excruciating pain attended by great shock and probably some other local manifestations, such as the immediate discharge of blood in the urine and some other symptoms that go with the kidney injury.''

We regard the evidence referred to as showing that the case is, to say the least, very close for the plaintiff, both on the question of the defendant's liability, and the question as to the extent of the plaintiff's injuries; and, therefore, the rulings of the court on evidence should have been substantially correct. Counsel for defendant made numerous objections to the court's rulings on evidence, some of which we will now consider. On re-cross, the witness Noakes was asked this question: ''You didn't see the sheave

strike the beam, did you?'' The question was ruled against on a mere general objection, viz: ''I object.'' The plaintiff relies on the condition of the elevator and its connections being such that it swayed, and that the sheave, in ascending, struck the beam at the fifth floor. Whether it did strike the beam is, therefore, vital. In his examination in chief, the witness had said, ''It must have struck the beam between the fourth and fifth floors,'' clearly indicating that this may have been a mere conclusion of the witness. Also, the witness was standing on the floor of the elevator as it ascended, operating it, and it is certainly not improbable that he was not looking up. It was important for the jury to know whether he saw the sheave strike the beam, and the ruling was prejudicially erroneous. No objection was made that the question was improper on re-cross examination. Hayes, plaintiff's foreman, testified that the plaintiff came to him, where he was, about 300 feet from the elevator, about half an hour after the accident, when this question was asked and answer given:

''Q. And what was his appearance then? A. He appeared all right.''

The answer was stricken out on plaintiff's motion. We think this was error. If plaintiff's attorney desired a more specific statement of plaintiff's appearance, he might have elicited it on cross-examination. The witness evidently meant that he saw nothing unusual in plaintiff's appearance, and the jury could not have understood otherwise. In view of the plaintiff's evidence, the question how he appeared half an hour after the accident was important. Hayes was asked this question: ''What did he say, if anything, about being hurt?'' to which plaintiff's counsel made this objection: ''I object, because from the witness' own testimony the plaintiff talked through an interpreter and he doesn't know what he said.'' The court sustained the objection. The plaintiff had already talked to Hayes through the interpreter, thereby making the

latter his agent, and the question was competent. Commonwealth v. Vose, 157 Mass. 393; Camerlin v. Palmer Co., 10 Allen, 539; McCormicks v. Fuller, 56 Ia. 43; Blazinski v. Perkins, 77 Wis. 9, 12; Miller v. Lathrop, 50 Minn. 91, 93; 1 Greenleaf on Ev., 16th ed., secs. 182 and 183; See, also, 2 Wigmore on Ev., sec. 1078, parag. 6, p. 1288, and 3rd ed., sec. 1810, parag. 2, p. 2346.

However, we cannot say that the ruling of the court was prejudicial to defendant, as no statement was made by counsel of what they expected to prove by the witness.

Keidis testified that he visited the plaintiff at his house in the evening of the day of the accident, and that there was blood coming out of his nose and he was moaning. The court overruled a motion to strike the word moaning from the answer. This was error (W. C. St. R. R. Co. v. Carr, 170 Ill. 478, same v. Kennedy, *id.* 508), but not reversible error.

The plaintiff having been recalled for further examination, the following occurred, when he was turned over to defendant's counsel for cross-examination:

"Q. Ask him if he has any objection to our doctor examining him?" Objection sustained. To the court: "Can't I even ask him for an examination?" The court: "No."

The principal expert medical witness for the plaintiff was Dr. Larsen, and he testified in respect to an examination made by him the morning of the day he testified, and evidently for the purpose of testifying, and it was of great importance to the defendant to have an examination of the plaintiff, or at least to have the jury know that he would not submit to an examination, if, being allowed to answer, he should refuse so to do. But the court absolutely refused to permit defendant's counsel to ask the plaintiff, in any form, if he would consent to an examination. While the Supreme Court has held that a plaintiff may refuse and cannot be compelled to submit to an examina-

tion, the court has also held that if the plaintiff refuses, the refusal is for the consideration of the jury. The question whether a plaintiff may be asked, in the presence of the jury, whether he will submit to an examination, has not been passed on by the Supreme Court. P. D. & E. R. R. Co. v. Rice, 144 Ill. 227, 232. But if plaintiff's refusal so to do is a fact proper to be considered by the jury, as has been held and is recognized in the case last cited, then the fact of refusal must be brought to the knowledge of the jury either by asking the plaintiff in the jury's presence whether he will submit to an examination, or asking him out of the jury's presence, and if he refuses, by producing before the jury proof of his refusal. Manifestly, there is no practical difference in the two methods, so far as the effect on the minds of the jury is concerned. On the hypothesis that a plaintiff is honest and his injuries unfeigned, and that he has nothing to conceal, why should he refuse to submit to an examination? We are of opinion that the refusal of the court to allow the plaintiff to be asked whether he would consent to an examination was prejudicial error.

Counsel for plaintiff say in their argument, "no claim is made that the verdict is excessive." Defendant made a motion in writing for a new trial, and among the specified grounds is: "The verdict of the jury is not warranted by the evidence and is excessive;" and it is assigned as error that the court erred in overruling defendant's motion for a new trial and in ruling that the verdict of the jury was not excessive. Counsel for defendant have argued that the plaintiff suffered no substantial injury, and that the verdict is contrary to the evidence. A verdict for $2,500 in this cause cannot be sustained, except on proof of some permanent injury. The only permanent injury claimed is displacement of the plaintiff's left kidney, and we think it manifest that such displacement has not been proved by the greater weight of the evidence. Upon inspection of the entire record

and after careful consideration of the evidence and the arguments of counsel, our conclusion is that the court erred in overruling defendant's motion for a new trial. The judgment will be reversed and the cause will be remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*