## Frank Sertaut, Appellee, v. Crane Company, Appellant.

## Gen. No. 17,082.

1. MASTER AND SERVANT—*defective elevator shoes.* Testimony of an elevator operator does not show that elevator guide shoes were worn where it appears from his testimony that he did not examine the shoes after the accident and that his knowledge of their condition was gained "through the jerking of the elevator."

2. MASTER AND SERVANT—*when testimony does not show reason for breaking of sheave on elevator car.* Where an elevator descended rapidly, when a sheave at the top of the car broke, testimony by the elevator operator that the sheave ran as close to a beam in the shaft as it could get, that there was a permanent place on the car for the sheave, and that it could not be put on in any other way, does not show that the sheave broke because it came in contact with the beam.

3. APPEALS AND ERRORS—*when counsel bases presumption on a presumption.* Counsel indulges in a series of presumptions where he alleges that guide shoes on an elevator were worn, which condition gave the car a lateral motion bringing a sheave in contact with a beam, whereby the sheave was broken, when the testimony does not show that the shoes were worn or that the sheave was broken by contact with the beam.

4. APPEALS AND ERRORS—*a presumption cannot be based on a presumption.* It would seem that a presumption as to the cause of an accident cannot be based on another presumption concerning the cause.

5. MASTER AND SERVANT—*what servant must prove to recover for negligence.* On action for injuries caused when the sheave at the top of an elevator car broke, allowing the car to descend rapidly, the servant must prove, among other things, that the appliances were defective, that the injuries were caused thereby and that the master had notice of the defect, or that he might have had by exercising ordinary care.

6. MASTER AND SERVANT—*evidence.* Allegations that an elevator was negligently allowed to remain in a dangerous condition, especially the parts connecting the ropes with the top of the car, and that the safety devices were defective, and that by reason thereof the elevator fell and injured the plaintiff, are not established where the evidence of the elevator operator, chiefly relied on, does not show such defective condition; an engineer who examined the car after the accident testified that no such defects as alleged existed and the testimony tends to show that the car descended too slowly to cause the safety devices to work.

Appeal from the Circuit Court of Cook county; the Hon. DUANE J. CARNES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Reversed with finding of fact. Opinion filed October 3, 1912.

ALDEN, LATHAM & YOUNG, for appellant.

JOHNSON & BELASCO, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

This is an appeal from a judgment of $1,000 entered in the Circuit Court of Cook county April 30, 1910, in favor of appellee, hereinafter called plaintiff, in an action on the case brought to recover damages for personal injuries received February 1, 1904, occasioned by the falling of an elevator, while appellee was in the employ of appellant, hereinafter called defendant, as a laborer. The verdict and judgment were rendered on a second trial,—the first trial resulting in a verdict for $2,500, upon which the court entered judg-

ment June 8, 1907. An appeal was taken to this court and that judgment was reversed and the cause remanded. Sertaut v. Crane Co., 142 Ill. App. 49. In its opinion the main court of this district, after elaborately setting forth the facts as they appeared from the transcript of the record of the first trial, said (p. 58): "We regard the evidence referred to as showing that the case is, to say the least, very close for the plaintiff, both on the question of the defendant's liability, and the question as to the extent of the plaintiff's injuries; and, therefore, the rulings of the court on evidence should have been substantially correct." This court then referred to certain rulings made by the trial court, (viz: in refusing to allow the witnesses Noakes, the elevator operator, and Hayes to answer certain questions, and in refusing to permit defendant's counsel to ask plaintiff, in any form, if he would consent to an examination of his person by a physician employed by defendant, particularly after plaintiff's principal expert medical witness, Dr. Larson, had testified in respect to an examination made by him of plaintiff on the morning of the day he testified), which it considered were erroneous, and concluded: "Counsel for defendant have argued that the plaintiff suffered no substantial injury, and that the verdict is contrary to the evidence. A verdict for $2,500 in this cause cannot be sustained, except on proof of some permanent injury. The only permanent injury claimed is displacement of the plaintiff's left kidney, and we think it manifest that such displacement has not been proved by the greater weight of the evidence. Upon inspection of the entire record and after careful consideration of the evidence and the arguments of counsel, our conclusion is that the court erred in overruling defendant's motion for a new trial."

After a careful examination of the transcript of the record of the second trial, now before us, and considering the "additional medical expert testimony," which counsel for appellee in his brief says was in-

troduced at the second trial, as well as all the other evidence in the case, we feel constrained to repeat the language of this court, viz: "The only permanent injury claimed is displacement of the plaintiff's left kidney, and we think it manifest that such displacement has not been proved by the greater weight of the evidence."

The plaintiff is a Lithuanian, was about twenty-seven years of age and had been in the employ of defendant as a laborer for about nine months, receiving as wages $1.75 per day. About six months after the accident plaintiff worked for the Lehigh Valley Transportation Company, loading and unloading freight, and later was employed in a scrap yard, moving scrap iron from one side of the yard to another, and has since been employed at hard manual labor. The elevator on which plaintiff and others were riding was operated by steam, and ran in a shaft which was enclosed on the north and south sides with wire netting. On the east and west sides there were bars at each floor which could be raised to allow passengers and freight to enter and be discharged from the elevator. At each floor there was a beam or header which formed the side of the elevator shaft, and which sustained the joists. The shaft was constructed of wooden columns. Attached to the center uprights on the north and south sides of the shaft were wooden guide strips, which ran from the basement to the top of the shaft. There were cast iron guide shoes attached to the elevator cage, which ran along these wooden guides for the purpose of keeping the elevator in place. The elevator was controlled by a lever in the car by which the change valve on the steam chest of the engine was operated, so that by certain movements of this lever the car could be made to ascend or descend as desired. The cable by which the elevator was operated ran around two cast iron sheaves, or grooved wheels or pulleys, which were attached to the top of the car.

By moving the lever in the car the operator could tilt the sheaves one way or the other, and accordingly lengthen or shorten the cable, and thereby operate the change valve on the engine. About nine o'clock on the morning of the accident, plaintiff and another laborer entered the car on the basement floor with two wheelbarrows filled with sand to take to the foundry on the fifth floor. Noakes, the elevator operator, ran the car up to the first floor, where two other employes of defendant got on the car,—Sherlock, foreman of the milling room, and Hauser, a carpenter. When the fourth floor was reached, Sherlock stepped off. Just after this and after the elevator had started upwards toward the fifth floor, one of the sheaves on top of the car broke off. The operator lost control of the car and the elevator ran down to the basement.

Plaintiff claimed he was injured when the car struck the basement. He testified, through an interpreter, on direct examination:

"When the car came to the basement I don't know what happened then. It struck hard in the basement. * * * I was hurt all over the back and sides. * * * They took me home. First they brought me to the company's doctor. There they fixed me up; * * * two men brought me home and put me to bed * * * I don't know who they were. * * * One man got on one side and took my arm, the other man on the other side took another arm. * * * I was laid up altogether six months."

On cross-examination he testified:

"I lost consciousness when it fell on the ground. * * * I didn't know anything from the time the elevator struck the bottom until I found myself in the doctor's office. * * * There were more than three or four places on my back where the skin was off. * * * There was a big hole in the small of my back and there were smaller ones on the sides. * * * When the elevator fell from the top to the bottom, I fell with it. * * * When I got to the bottom and

the elevator stopped I was lying on my back.  *  *  *. I fell just across the middle of the wheelbarrow. There was sand in it. I fell in the sand.  *  *  * The other men in the elevator fell down at the same time I fell. *  *  * They fell on top of one another. I don't know if they got up and went out of the elevator before I did. I didn't see them.''

At the time of the second trial Noakes, the elevator operator, who testified at the first trial, was physically unable to appear in court, and by agreement of counsel portions of his testimony given on the first trial were admitted in evidence. In such admitted testimony, brought out on direct examination at the first trial, was the following:

''The elevator was between the fourth and fifth floors when the sheave broke.  *  *  * The elevator dropped fast;  *  *  * faster than its ordinary speed in descending.  *  *  * It struck the bottom pretty hard.  *  *  * After the elevator struck, the cage was bent to one side, the ropes were loose, that is, the cable that hauls the elevator was loose after the rope came off the drum, the hoisting cables came off the drum. There was two loads of sand on the elevator. One of them didn't weigh over 150 pounds. The other was quite heavy—the wheelbarrow alone weighed over 300 pounds, and it was loaded with sand to the top.''

In such admitted testimony, brought out on cross-examination at the first trial, was the following:

''The elevator simply ran down on its own steam and the weight there was on the elevator. The engine had to work going down just the same as going up.'' (Papers shown witness) ''I signed that statement and swore to it.  *  *  * I have read it. I guess it is true.''

The statement referred to is a statement signed and sworn to by Noakes on February 10, 1904, descriptive of the accident, portions of which are:

''When I got about half way between the fourth and fifth floors I heard a crack of a casting and I was hit on the head with a piece of the sheave;  *  *  * the elevator began to descend;  *  *  * we went down

at about the ordinary speed. The dogs did not catch and stop the elevator for the reason the elevator did not descend fast enough to make the dogs catch    *    *    * As we struck the bottom of the elevator shaft we all got off the elevator. It did not knock any of us down or over and no one seemed to be injured.    *    *    * The cage was not broken and neither was the floor. *    *    * About an hour after the accident    *    *    * the elevator was running.    *    *    * The jolt of the elevator as it struck the pit did not bring any of us to our knees."

Szaulis, another witness for plaintiff testified through an interpreter:

"At the time this elevator fell I was working not far from the elevator.    *    *    * When the elevator struck the bottom there was a noise just like a cannon. *    *    * I did not get near enough to see what happened."

Keidis, another witness for plaintiff, testified through an interpreter:

"I was digging sand,    *    *    * and I heard a noise, 'boom,' then I went to see near the elevator. I saw three men in the elevator. I saw Sertaut there. I saw him on the wheelbarrow over on his back.    *    *    * He was on a load of sand.    *    *    * I saw three men lying in the elevator, and Sertaut on the wheelbarrow.    *    *    * I was only there a minute or two. *    *    * I didn't pay any attention to what anybody did. All I saw    *    *    * was Sertaut lying across one wheelbarrow and two other men sitting on the other side of the wheelbarrow. Just as soon as I saw these three men I made a swift turn upstairs and got away as fast as I could. I didn't hear anything about anybody being hurt.    *    *    * I was scared and I hurried."

Hauser, the carpenter and a witness for defendant, testified:

"I was on the elevator at the time.    *    *    * Mr. Sherlock was also on the elevator. He got off on the fourth floor and the elevator went down.    *    *    * As the elevator started to go down I took hold of the

barrow, put my hands on it, and put my weight on my toes, so as to take the weight off if it struck. After the elevator got down I walked out. All the other men in the elevator walked out also. I did not get any shock at the bottom. * * * I did not see anybody on the elevator fall down or get knocked down. * * * Before I went out of the elevator there was no man or men lying on the floor of the elevator or across any of the wheelbarrows. The elevator never goes slow as a rule, always goes fast. It went to the bottom but did not strike it hard nor make any noise. * * * No man on that elevator appeared to me to be hurt in any way.''

Hayes, the foreman of the labor gang and a witness for defendant, testified:

''I remember there was some question regarding this man being hurt. This first came to my attention when Sertaut came to me. It was about a half hour after this elevator had made this trip. He said he was hurt. He looked normal at the time. I could not see anything the matter with him. I sent him to Dr. Harvey's office and he walked there. I saw him about an hour afterwards * * * about six hundred feet from Dr. Harvey's office. .He * * * looked normal. * * * He simply asked me to go home. * * * I told him if he was not feeling well to go home. * * * When he went home he walked, * * * nobody carried him on each side.''

Sherlock, a witness for defendant, who stepped off of the elevator when in ascending it had reached the fourth floor, testified:

''After I got off I swung around to throw an arm that was there to keep the passengers from getting near the elevator. I saw the elevator had gone down in place of going up. When I saw it go at quite a little speed, not very fast, and stop after that, I thought something was wrong. * * * I went down to the basement and when I got there I saw Mr. Hauser. He was standing to one side. * * * I saw three men down there when I got there. I saw no one lying on the floor of the elevator, nor anyone lying across a

wheelbarrow. I saw a man sitting on a wheelbarrow. I did not see anybody that was hurt, nor  *  *  * anybody who looked as though he was hurt.''

Doctor Harvey, a physician in the employ of defendant at the time of the accident testified that plaintiff walked into his office during the forenoon of February 1, 1904, and stated that he had been hurt; that at the witness' request plaintiff removed his clothing and the witness examined him carefully; and that Rudolph Hora, an assistant, was present at the time. Both Harvey and Hora testified that they found no marks of injury on plaintiff, no signs of any bleeding or contusions, no evidences of nervous shock, that plaintiff appeared normal in all respects, and that after the examination plaintiff put on his clothes, walked out of the office and went back as they supposed, to his foreman.

In addition to contending that the verdict is manifestly against the weight of the evidence, counsel for defendant contend that the evidence does not show that the defendant was guilty of any negligence. The negligence charged in the declaration is fully set forth in the former opinion of this court and need not be repeated. To sustain the allegations of negligence in the declaration counsel for plaintiff rely chiefly, if not entirely, upon the testimony of the elevator operator, Noakes, and particularly upon his statement that the ''guide shoes were worn a little bit.'' Counsel for plaintiff state in their brief:

''Appellee's contention is that appellant carelessly and negligently permitted the guide shoes to be worn to such an extent as to cause the elevator, while being operated to have a lateral motion, which brought the sheave in contact with the beam near the shaft under the fifth floor, thereby breaking the sheave, which caused the elevator to descend rapidly and thereby injured appellee who was riding on the elevator.''

The only facts in the above statement admitted by the defendant are that a sheave in the elevator broke,

that the elevator descended rapidly and that plaintiff was riding on the elevator at the time. Noakes testified:

"The elevator was between the fourth and fifth floors when the sheave broke. * * * I didn't make an examination of the elevator immediately after the accident. I helped fix her up again, get her ready. * * * It was shown that the guide shoes were worn a little bit. I couldn't say how much. I am no machinist. * * * The guide shoes keep the elevator from having too much play in the shaft. * * * I know that they were worn, *through the jerking of the elevator.* * * * I didn't examine the shoes after the accident. * * * I don't know how long these shoes were worn before that time. * * * I observed the lateral motion of the elevator very often; they are bound to shake some. I don't remember how often I observed this."

Counsel for plaintiff argues that this testimony shows that the guide shoes were in fact worn. This does not follow, for the reason that the testimony of the witness shows that he did not examine the shoes after the accident and that such knowledge as he claimed to have as to their being worn was because of or "through the jerking of the elevator." Noakes further testified that:

"The sheave ran close up to the beam, as close up *as it could get.* This beam * * * is a part of the fifth floor, and was in the elevator shaft on the right side. * * * There was a permanent place on the top of the elevator for a sheave. The elevator was made to have that sheave just so. It couldn't be put on any other way except at that one place. The second sheave could not have been put on any different than the first one. The sheave there now is just in the same place it was then. * * * I never knew the sheave that is there now and the beam to strike."

This testimony does not show that at the time of the accident the sheave was broken *because* the same was brought in contact with the beam, or that there was

any unusual lateral motion of the elevator *because* of worn guide shoes. And there is no other testimony in the record showing what caused the sheave to break; or that the sheave and the beam came in contact, or that there was any unusual lateral motion of the elevator at the time of the accident, or that the guide shoes were worn, or that the sheave was defective. It seems to us that counsel for plaintiff in his above contention indulges in a series of presumptions. "It is the law that a presumption cannot be based on a presumption." Globe Insurance Co. v. Gerisch, 163 Ill. 625; Condon v. Schoenfeld, 214 Ill. 226. Thomas W. Smith, chief engineer for defendant for nineteen years and at the time of the accident, and who, at the time of the second trial was chief engineer of the Corn Products Company, testified that he "was at the elevator about fifteen minutes after the accident before anything had been done with it," and that he "saw the sheave off * * * examined the piece of metal that was broken, it was a clean break, there was no defect in it before;" that he had measured the space between the edge of the sheave and beam and that it was one inch; that he inspected the elevator every day, including the day before the accident; that there must be "lateral motion in there to make the elevator pass up and down between the guides," and that his last examination before the accident showed "not over five-eighths or three-fourths of an inch lateral motion;" that "this sheave could not have struck the beam in the elevator shaft;" that he examined the beam after the accident and that there was "no scratch or mark * * * to indicate that the sheave had struck the beam;" that the city elevator inspector made a thorough examination of the elevator every six months; that after the accident Smith put on another sheave that morning, and after putting it on he found that the sheave "could not have gotten closer to the beam on the fifth floor than one inch," and that it was put

in the same position as the first sheave. By the testimony of said Smith and two elevator experts it was shown that there were three safety devices on the car, (a) an arrangement which would automatically stop the engine when the hoisting cable became slack, (b) safety appliances called "dogs" which would automatically stop the car when it had attained a certain speed, and (c) an automatic stop at the bottom of the shaft set to start stopping the car within twenty-two inches from the floor of the basement; and that, if a sheave breaks, the elevator cannot descend faster than the speed for which the engine is set, which at the time of the accident was 375 to 380 feet per minute, or about four miles per hour.

Before a recovery can be sustained in such a case as this it is necessary for the plaintiff to prove, among other things, not only the existence of a defect in the appliances and that the injury was occasioned thereby, but also that the master had notice of the defect or might have had by the exercise of ordinary care. Armour v. Brazeau, 191 Ill. 117; Sack v. Dolese, 137 Ill. 129; Goldie v. Werner, 151 Ill. 551.

In view of the evidence in this case, we are of the opinion that the defendant was not guilty of negligence as charged in the declaration, and so find. The judgment of the Circuit Court of Cook county is reversed.

*Reversed with finding of fact.*